UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
OUT OF THE BLUE WHOLESALE, LLC,

                           Plaintiff,

                                       MEMORANDUM & ORDER
    -against-                   19-CV-0254(JS)(AYS)

PACIFIC AMERICAN FISH CO. INC.,

                           Defendant.
-------------------------------------X
APPEARANCES
For Plaintiff:       William H. Sweeney, Jr., Esq.
                       742 Veterans Highway
                       Hauppauge, New York 11788

For Defendant:       David L. Prince, Esq.
                       1912 E. Vernon Avenue #100
                       Los Angeles, California 90058

SEYBERT, District Judge:

        On December 19, 2018, plaintiff Out of the Blue Wholesale, LLC ("Plaintiff") commenced this action against defendant Pacific American Fish Co. Inc. ("Defendant") in the Supreme Court for the State of New York, County of Suffolk. (Notice of Removal, D.E. 1, at 1-2.)  On January 11, 2019, Defendant removed the action to this Court.  (Notice of Removal.) Before the Court is Defendant's motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Complaint for lack of personal jurisdiction.  (Def. Mot., D.E. 5.) For the reasons set forth below, Defendant's motion is DENIED.

FACTUAL BACKGROUND[1]

Plaintiff, a New York limited liability company, is a seafood distributor with locations in Hampton Bays, New York and Bronx, New York. (Compl. ¶¶ 1-2.) In March 2017, Plaintiff began purchasing fish for resale from Defendant, a California corporation with offices in Vernon, California and Boston, Massachusetts. (Compl. ¶¶ 3, 7-8.) Plaintiff purchased fish from Defendant's Boston office through Defendant's employee, Anthony Mirarchi.[2] (Compl. ¶¶ 11-14.) Plaintiff paid for its purchases "though the ACH [Automated Clearing House] services of Chase Bank payable to the account specified by [D]efendant." (Compl. ¶ 15.) Between March 24, 2017, when their business relationship began, and August 14, 2018, when their relationship ended, Plaintiff purchased $169,080.44 worth of seafood from Defendant. (Paparizou Aff., D.E. 8-1, ¶ 20.)

On July 30, 2018, Plaintiff received an email from Mirarchi's email address with instructions for Plaintiff to change the account to which it had been sending electronic payments to Defendant. (Compl. ¶ 20.) This email has since been discovered

---

[1] The following facts are taken from the Complaint and are assumed to be true for purposes of this Memorandum and Order. (See generally Compl., D.E. 1-1.)

[2] According to Mirarchi's Declaration, he is an employee of Defendant's Boston office but typically works from his home office in the area of Philadelphia, Pennsylvania. (Mirarchi Decl., Def. Reply Ex. 1, D.E. 9-1, ¶ 2.)

to have been sent by an individual that hacked Defendant's computer system. (Compl. ¶ 21.)

On the same day it received instructions to make payments to a different account, Plaintiff notified Defendant that the sum demanded for the invoices at issue, $14,411.51, had been processed for payment to Defendant's original account (the "Original Account"). (Compl. ¶ 22.) Plaintiff emailed Mirarchi confirmation of that payment. (Compl. ¶ 23.) Plaintiff then received an email from Mirarchi's account--which email was later discovered to be fraudulent--instructing Plaintiff to cancel the transaction and reprocess the payment using the new account number provided to Plaintiff earlier that day (the "First Fraudulent Account"). (Compl. ¶¶ 24-25.) Plaintiff cancelled the payment to the Original Account. (Compl. ¶ 26.)

On August 6, 2018, in connection with different invoices, Plaintiff paid $2,742.63 to the First Fraudulent Account. (Compl. ¶ 27.)

On August 7, Plaintiff received an email from Mirarchi asking about the status of the earlier $14,411.51 payment, and Plaintiff responded that the payment was cancelled at Defendant's request. (Compl. ¶¶ 28-29.) That day, Plaintiff was instructed by email from Mirarchi's email address that it should direct payment to yet another account (the "Second Fraudulent Account") and "to immediately inform him because accounts receivable

3

urgently needs a response." (Compl. ¶ 30.) Plaintiff scheduled a payment of $14,411.51 to be sent to the Second Fraudulent Account on August 8, 2018. (Compl. ¶ 31.)

On August 8, 2018, Mirarchi contacted Plaintiff to inquire about the status of the $14,411.51 payment, and Plaintiff sent him a copy of the payment confirmation. (Compl. ¶¶ 32-33.)

On August 10, 2018, Mirarchi emailed Plaintiff, stating that Defendant needed Plaintiff to pay its invoices, some of which were seventy days past due. (Compl. ¶ 35.) Plaintiff emailed payment confirmations for two invoices ($14,411.51 and $2,442.05) to Mirarchi and Jared Amarai, Defendant's employee who headed its accounts receivable department. (Compl. ¶¶ 36, 38.) Amarai immediately responded and informed Plaintiff that he would review the account. (Compl. ¶ 39.)

On August 17, 2018, Mirarchi called Plaintiff and informed it that Defendant's computer system and his company email address had been hacked. (Compl. ¶ 40.) That day, Mirarchi emailed Plaintiff and instructed it to notify its bank that the last two payments to Defendant were made to fraudulent accounts. (Compl. ¶ 41.) Mirarchi also informed Plaintiff that many of Defendant's customers had received fraudulent emails from Defendant's hacked computer system and that many customers had made payments to fraudulent accounts. (Compl. ¶¶ 42-43.)

Because Plaintiff received Defendant's notification regarding its payments to fraudulent accounts more than one week after the dates of the transactions, the money had been paid out of Plaintiff's account. (Compl. ¶¶ 44-45.)

On October 18, 2018, Mirarchi confirmed to Plaintiff that the messages from his email account had been fraudulent. (Compl. ¶ 47.) He then demanded that Plaintiff pay to Defendant the amount that Plaintiff had paid to fraudulent accounts, which totaled $17,154.14. (Compl. ¶ 48.) Plaintiff did not pay the amount demanded, instead responding that it had already paid the amount due in accordance with instructions sent from Mirarchi's hacked corporate email address. (Compl. ¶ 49.) This lawsuit followed.

PROCEDURAL HISTORY

Plaintiff's Complaint alleges that Defendant: (1) engaged in materially misleading billing practices in violation of the New York General Business Law, (Compl. ¶¶ 55-58),[3] (2) "breached of [sic] implied warranty and implied covenant of good faith and fair dealing," (Compl. ¶¶ 59-61), and (3) "has been unjustly enriched," (Compl. ¶¶ 62-67). Plaintiff seeks a

---

[3] Plaintiff alleges that "plaintiff engaged in billing practices to the defendant were [sic] misleading in a material way" and that "[b]y its actions the plaintiff has violated the General Business law [sic] of the State of New York," (Compl. ¶¶ 55, 57 (emphasis added).) The Court assumes that Plaintiff transposed "plaintiff" and "defendant" in error.

5

declaratory judgment that it paid its $17,154.14 debt to Defendant, (Compl. ¶ 50); damages of $17,154.14 under two causes of action, (Compl. ¶¶ 54, 67); unspecified damages for Defendant's alleged violation of the General Business Law, (Compl. ¶ 58); damages of $1,000,000 for Defendant's alleged breach of the "implied warranty and implied covenant of good faith and fair dealing," (Compl. ¶¶ 59, 61); punitive damages, (Compl. ¶¶ 68-71); and costs, disbursements, and attorney's fees, (Compl. at 11).

On January 18, 2019, Defendant moved to dismiss for lack of personal jurisdiction. (See Def. Br., D.E. 5 at 2-8.) It argues that Plaintiff has not met its burden to establish that the Court has general jurisdiction over Defendant under New York Civil Practice Law and Rules ("CPLR") section 301 or specific jurisdiction over it under any of the bases listed in CPLR section 302. (Def. Br. at 3-7.) Defendant contends that even if Plaintiff could establish a basis for jurisdiction over Defendant, the exercise of that jurisdiction would violate the Due Process Clause of the U.S. Constitution. (Def. Br. at 7-8.)

On March 4, 2019, Plaintiff opposed the motion, filing a memorandum of law, (Pl. Opp., D.E. 8), as well as the affidavit of Plaintiff's president, Juliana Paparizou, and several exhibits. Plaintiff does not contend that Defendant is subject to general jurisdiction in New York but argues that it has demonstrated one basis for specific jurisdiction over Defendant. (Pl. Opp. at 2-

6

10.) Specifically, Plaintiff maintains that Defendant "transacted business" in New York such that it is subject to personal jurisdiction under CPLR section 302(a)(1). (Pl. Opp. at 2-10.) Plaintiff also contends that the exercise of jurisdiction over Defendant would be consistent with due process. (Pl. Opp. at 10-12.)

On March 19, 2019, Defendant filed a reply in further support of its motion, (Def. Reply, D.E. 9), as well the Declaration of Mirarchi, (Mirarchi Decl.). Defendant argues that it is not subject to jurisdiction under CPLR section 302(a)(1) because it does not have sufficient contacts with New York, (Def. Reply at 2-7), and it reiterates that exercising jurisdiction over it would not comport with due process, (Def. Reply at 7-8).

## DISCUSSION

### I. Legal Standard

"The plaintiff bears the burden of demonstrating personal jurisdiction over the person or entity being sued," State of New York v. Mountain Tobacco Co., No. 12-CV-6276, 2016 WL 324970, at *4 (E.D.N.Y. Jan. 26, 2016) (citing Penguin Grp. (USA) Inc. v. Am. Buddah, 609 F.3d 30, 34 (2d Cir. 2010)), and the weight of the burden "varies based on the litigation's procedural posture," id. (citing Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)). Before discovery commences, the plaintiff may overcome "a jurisdiction[-]testing motion by

7

'pleading in good faith, legally sufficient allegations of jurisdiction.'" Id. (quoting Ball, 902 F.2d at 197)). The Court may also look to documents outside of the pleadings and "'rely on submitted affidavits and other supporting materials submitted in relation to the motion.'" Micro Fines Recycling Owego, LLC v. Ferrex Eng'g, Ltd., 17-CV-1315, 2019 WL 1762889, at *2 (S.D.N.Y. Apr. 22, 2019) (quoting Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 225 (S.D.N.Y. 2013)). "When a court relies only upon the pleadings and supporting affidavits, a plaintiff need only make a prima facie showing of personal jurisdiction over a defendant." Id. (citing Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005)).

A plaintiff must satisfy three elements to establish personal jurisdiction over a defendant: "'(1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) the exercise of jurisdiction must be consistent with constitutional due process principles.'" Roxx Allison Ltd. v. Jewelers Inc., 385 F. Supp. 3d 377, 380 (S.D.N.Y. 2019) (internal quotation marks omitted) (quoting Quinio v. Aala, 344 F. Supp. 3d 464, 479-80 (E.D.N.Y. 2018)). "In a diversity action, whether a court has personal jurisdiction over a defendant 'is determined by the law of the forum in which the court sits'"--in this matter, New York. Rosenblatt v. Coutts & Co. AG, 750 F.

App'x 7, 9 (2d Cir. 2018) (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)).

Because Defendant does not contest service, the Court examines (1) whether there is a statutory basis for jurisdiction over Defendant under New York's long-arm statute and (2) whether the exercise of jurisdiction is consistent with due process principles.

## II. New York's Long-Arm Statute

New York's long-arm statute allows for the exercise of specific "personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1).[4] Puzzlingly, despite the second clause's seeming applicability, the parties did not brief whether Defendant "contract[ed] anywhere to supply goods or services in the state," N.Y. C.P.L.R. 302(a)(1), nor did they file any of their purchase orders or contracts with the Court. Considering the parties' briefs and filings, the Court limits its discussion to whether Defendant "transacted business" in New York.

To determine whether jurisdiction exists under CPLR section 302(a)(1), a court must analyze "'(1) whether the

---

[4] As discussed, Plaintiff does not argue that the Court has general jurisdiction over Defendant or that any other bases for specific jurisdiction in CPLR section 302 apply.

9

defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction.'" Rosenblatt, 750 F. App'x at 9 (quoting Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012)). This "'is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" Roxx Allison Ltd., 385 F. Supp. 3d at 380 (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 43, 527 N.Y.S.2d 195 (1988)).

To the first requirement, "[t]he New York Court of Appeals has instructed that the 'overriding criterion' in determining whether an entity 'transacts any business' in New York within the meaning of the statute is whether the entity 'purposefully avails itself of the privilege of conducting activities within New York.'" Rosenblatt, 750 F. App'x at 9-10 (quoting Paterno v. Laser Spine Inst., 24 N.Y.3d 370, 377, 998 N.Y.S.2d 720 (2014)). "The 'totality of the circumstances' must be assessed in determining whether a defendant has 'invoke[ed] the benefits and protections of [New York's] laws.'" Id. (alterations in original) (quoting Licci, 673 F.3d at 61-62). The Second

Circuit has "identified four non-exclusive factors that bear on [the] determination in this regard. Those are:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [parties to that contract] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state."

Rosenblatt, 750 F. App'x at 10 (quoting Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004)).

Based on the evidence before the Court, the factors fall as follows:

First, Defendant's relationship with Plaintiff, a New York entity that Defendant knew was headquartered in New York, spanned a substantial length of nearly one and one-half years. (Paparizou Aff. ¶¶ 2, 20; Mirarchi Decl. ¶ 3.) Notably, during their relationship, Defendant sold $169,080.44 worth of fish to the New York-based Plaintiff. (Paparizou Aff. ¶ 18.)

Second, any contracts or purchase orders were negotiated over the phone and by email by Defendant's agent, Mirarchi, mainly while he was in Pennsylvania, (Mirarchi Decl. ¶ 5), and by Plaintiff in Bronx, New York, (Paparizou Aff. ¶¶ 1-3, 6), without

11

Mirarchi ever going to New York, (Mirarchi ¶ 4). These phone and email "communications had just as much connection to New York as to [Pennsylvania]." Roxx Allison Ltd., 385 F. Supp. 3d at 381 (citations omitted). Additionally, the Court notes that Mirarchi initiated the business relationship with Plaintiff, (Paparizou Aff. ¶ 3), and extensively communicated with Plaintiff: Paparizou documented no less than fifteen email solicitations from Mirarchi during a period spanning approximately one month in 2017. (Paparizou Aff. ¶ 15). "The case law supports that such business solicitations, communications, and negotiations constitute 'business transactions' and are sufficient to satisfy CPLR Section 302(a)(1)." Porco v. Phoenix Bldg. Corp., No. 18-CV-5938, 2019 WL 2210659, at *4 (S.D.N.Y. May 21, 2019) (collecting cases).

Further, the shipments of fish were delivered to Plaintiff in New York, and Defendant knew and relied on that fact, emailing Plaintiff: "Here is PREORDER Pallet Pricing for New Whole Salmon: DELIVERED to NY." (Mirarchi Email, Pl. Opp. Ex. A, D.E. 8-2, at ECF p. 4 (emphasis added); see (Paparizou Aff. ¶ 6).) A "single act of shipping a [product] might well be sufficient, by itself, to subject [a defendant] to the jurisdiction of a New York court under section 302(a)(1)." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 170 (2d Cir. 2010). Finally, Plaintiff resold the fish in New York--a fact that, given his extensive

communications with Plaintiff, Mirarchi almost certainly knew. (Paparizou Aff. ¶ 2.)

Third, according to defense counsel's representation to the Court, there was no choice-of-law clause in the parties' agreement(s). (Def. Reply at 6.)

Fourth, Defendant emailed invoices to Plaintiff in New York, (Compl. ¶¶ 2, 18-19), and Plaintiff sent its payments to California, (Mirarchi Decl. ¶ 6).

In sum, Defendant initiated contact with the New York-based Plaintiff, sent it frequent solicitations, and sold it substantial amounts of seafood for delivery and resale in New York. Therefore, the Court concludes that Defendant transacted business in New York, purposefully availing itself of the privilege of conducting activities within the state. See Roxx Allison Ltd, 385 F. Supp. 3d at 383 (quoting House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162, 167 (S.D.N.Y. 2010)) ("'By purposefully creating a continuous relationship with a New York corporation and by maintaining constant communications with it,' a defendant avails himself or herself 'of the benefits and privileges of transacting business in New York and is therefore subject to jurisdiction under N.Y. C.P.L.R. § 302(a)(1).'").

The Court next analyzes whether Plaintiff's claim arose from Defendant's transaction of business in New York. "The New York Court of Appeals has explained that a plaintiff must provide

13

'an articulable nexus or substantial relationship between defendant's New York activities and the parties' contract, defendant's alleged breach thereof, and [plaintiff's] potential damages.'" Rosenblatt, 750 F. App'x at 12 (quoting D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro, 29 N.Y.3d 292, 299, 78 N.E.3d 1172, 1177 (2017)).

Defendant contends that "there is no suggestion the claims Plaintiff now brings 'arise from' [sales of fish] within New York. Instead, it is abundantly clear in the Complaint that the causes of action now before the Court were a result of Plaintiff's purchases from [Defendant's] Boston office." (Def. Br. at 5.) The Court struggles to see the significance of this distinction. Plainly, Plaintiff's payments to Defendant in exchange for seafood are an integral part of Defendant's transaction of business in New York. Because this action arises from Plaintiff's attempts to make such payments, the second requirement of CPLR section 302(a)(1) is satisfied.

Accordingly, the Court finds that there is a statutory basis for personal jurisdiction over Defendant under New York's long-arm statute and turns to whether the exercise of that jurisdiction comports with due process.

III. Due Process

"There are two components to the due process analysis undertaken to determine whether [a defendant] is subject to the

court's jurisdiction for commercial activity involving the State of New York: (1) the minimum contacts inquiry and (2) the reasonableness inquiry." Chloe, 616 F.3d at 171 (citing Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d, 37-38 (2d Cir. 2001)). "Although 'section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive,' it is 'rare' for a case where 'personal jurisdiction [is] permitted under the long-arm statute' to 'be prohibited under due process analysis.'" Roxx Allison Ltd, 2019 WL 3000956, at *4 (alteration in original) (quoting Licci, 732 F.3d at 170)).

To the minimum contacts inquiry, the Court "conclude[s] that assertion of personal jurisdiction over [Defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute." Chloe, 616 F.3d at 171. That is, Defendant purposefully solicited business from Plaintiff, a New York entity headquartered in New York; entered and maintained a nearly one-and-one-half-year-long business relationship with Plaintiff; frequently contacted Plaintiff to drive additional sales; and sold Plaintiff approximately $170,000 worth of seafood for delivery and resale in New York. "In other words, jurisdiction is appropriate in New York because [Defendant] has developed and served a market for its products there. By actually sending items to New York, there can be no doubt that [Defendant's] conduct was 'purposefully directed toward the forum [s]tate.'" Id. (emphasis in original)

15

(quoting Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 110, 107 S. Ct. 1026, 1031, 94 L. Ed. 2d 92 (1987)) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)).

"Even where an out-of-state defendant purposefully avails [itself] of the forum state, plaintiffs must still demonstrate that the exercise of jurisdiction . . . is [ ] reasonable under the Due Process Clause." Id. (quoting Asahi, 480 U.S. at 113, 107 S. Ct. at 1033). To determine whether it is reasonable to exercise jurisdiction, courts consider the following five factors: "'(1) the burden on the defendant, (2) the interests of the forum [s]tate, [ ] (3) the plaintiff's interest in obtaining relief[,] . . . (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several [s]tates in furthering fundamental substantive social policies.'" Id. at 173 (quoting Asahi, 480 U.S. at 113, 107 S. Ct. at 1033). The parties did not brief these factors.

Regarding the first factor, while there will be some burden on Defendant if it must litigate this matter in New York, "the burden is slight because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" Micro Fines, 2019 WL 1762889, at *4 (quoting Metro. Life Ins. Co. v. Robertson-Ceco

16

Corp., 84 F.3d 560, 566 (2d Cir. 1996)). Moreover, if Plaintiff were forced to litigate in California, it would face the same burden, so this inconvenience "cuts both ways." See Chloe, 616 F.3d at 173. "The second factor favors Plaintiff because '[a] State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.'" Micro Fines, 2019 WL 1762889, at *4 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S. Ct. 2174, 2182, 85 L. Ed. 2d 528 (1985)). The third factor also favors Plaintiff, as it is a New York entity headquartered in New York. Based on the facts currently before the Court, the fourth and fifth factors are neutral. Considering these factors, the Court concludes that "asserting jurisdiction over [Defendant] comports with 'traditional notions of fair play and substantial justice' such that it satisfies the reasonableness inquiry of the Due Process Clause." Chloe, 616 F.3d at 173 (quoting Int'l Shoe Co. v. State of Wash., 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)).

Accordingly, the exercise of jurisdiction is consistent with the Due Process Clause, and Plaintiff has made the requisite showing of personal jurisdiction over Defendant.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (D.E. 5) is DENIED.

SO ORDERED.

    /s/   JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August __23__, 2019
       Central Islip, New York